# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**DANIELLE BAR-NAVON,**

                **Plaintiff,**

**-vs-**                                      **Case No.  6:06-cv-1434-Orl-19KRS**

**SCHOOL BOARD OF BREVARD**
**COUNTY, FLORIDA,**

                **Defendant.**

_____

# ORDER

This case comes before the Court on the following:

1.     Plaintiff Danielle Bar-Navon's Dispositive Motion For Partial Summary Judgment And Incorporated Memorandum Of Law (Doc. No. 34, filed Sept. 4, 2007);

2.     Plaintiff's Notice Of Serving Documents In Support Of Plaintiff's Dispositive Motion For Summary Judgment (Doc. No. 35, filed Sept. 4, 2007);

3.     Defendant School Board Of Brevard County, Florida's Amended Motion For Summary Judgment And Memorandum Of Law In Support Of Motion (Doc. No. 40, filed Sept. 12, 2007);

4.     Defendant's Notice Of Filing Defendant's Exhibits In Support Of Amended Motion For Summary Judgment And Memorandum Of Law In Support Of Motion (Doc. No. 42, filed Sept. 13, 2007);

5.     Defendant's Memorandum In Opposition To Plaintiff's Dispositive Motion For Partial Summary Judgment (Doc. No. 43, filed Sept.14, 2007);

6.      Plaintiff's Response To Defendant's Amended Motion For Summary Judgment (Doc. No. 45, filed Sept. 21, 2007); and

7.      Plaintiff's Notice Of Filing Documents In Support Of Plaintiff's Response To Defendant's Amended Motion For Summary Judgment (Doc. No. 46, filed Sept. 21, 2007).

## Background

### I.      Procedural History

Plaintiff Danielle Bar-Navon, by and through her parent and next friend Boaz Bar-Navon, filed an Amended Complaint alleging a violation of United States Code Title 42, Section 1983 (2006). (Doc. No. 10, filed Nov. 20, 2006.) Specifically, Plaintiff asserts that Defendant School Board of Brevard County, Florida is violating her First Amendment right to free speech by punishing her for wearing jewelry in her body piercings. (*Id.*) In response Defendant has filed an Amended Motion for Summary Judgment. (Doc. No. 40, filed Sept. 12, 2007.) Plaintiff has also filed a Motion for Summary Judgment on the question of liability. (Doc. No. 34, filed Sept. 4, 2007.) Both parties have filed oppositions to these motions. (Doc No. 43, filed Sept. 14, 2007; Doc. No. 45, filed Sept. 21, 2007.)

### II.      Material Facts as to Which There Is No Genuine Dispute

During the school year of 2006-2007, Plaintiff attended Viera High School, a public school owned and operated by Defendant. (Doc. No. 10 at pp. 1-2, ¶¶ 5-6; Doc. No. 35-2 at p. 6; Doc. No. 42-4 at pp. 1-2, ¶¶ 2-4.) This year Plaintiff is in the tenth grade at Viera High School and is subject to Defendant's Dress Code. (Doc. No. 35-2 at pp. 6, 11-12; Doc. No. 42-5 at pp. 6, 11-12.) The provision of the Dress Code at issue states: "Pierced jewelry shall be limited to the ear. Dog collars,

-2-

tongue rings, wallet chains, large hair picks, chains that connect one part of the body to another, or other jewelry/accessories that pose a safety concern for the student or others shall be prohibited." (Doc. No. 35-2 at p. 12; Doc. No. 42-3 at p. 2; Doc. No. 42-5 at p. 12.)

Plaintiff wears jewelry in a number of visible piercings on her body.  (Doc. No. 35-2 at pp. 12-14; Doc. No. 42-5 at pp. 12-14.)  On Plaintiff's first day at Viera High School in August 2006, she was wearing a nose ring, a lip ring, and two studs beneath her lip.[1]  (Doc. No. 35-2 at pp. 12-13; Doc. No. 42-5 at pp. 12-13.)  As she exited the school bus that morning, she was addressed by the high school principal, Mark Tormoen, and the disciplinary dean, Debra Neufeld.  (Doc. No. 35-2 at p. 12; Doc. No. 42-5 at p. 12.)  Mr. Tormoen and Ms. Neufeld told Plaintiff that she would have to either remove her piercing jewelry or call her father and have him take her from school.  (Doc. No. 35-2 at p. 14; Doc. No. 42-5 at p. 14.)  Plaintiff refused to take the jewelry out of her piercings, and so she was asked to leave school for the day.  (Doc. No. 35-2 at p. 14; Doc. No. 42-5 at p. 14.)

When Plaintiff's father, Mr. Bar-Navon, arrived at the school, he and Plaintiff spoke to Mr. Tormoen about the Dress Code.  (Doc. No. 35-2 at pp. 14-15; Doc. No. 42-5 at pp. 14-15.)  Mr. Tormoen said that he did not personally mind the jewelry, but he was bound to enforce Defendant's policy because "his hands were tied."  (Doc. No. 35-2 at p. 15; Doc. No. 35-3 at p. 9; Doc. No. 42-5 at p. 15.)  After this meeting, Plaintiff left school with her father.  (Doc. No. 35-2 at pp. 14-15; Doc. No. 42-5 at pp. 14-15.)

At some point after leaving Mr. Tormoen's office, Plaintiff was informed that David Piccolo, the Area II Superintendent in charge of Viera High School, had been alerted to Plaintiff's problem

---

[1]      Plaintiff has also worn jewelry to school through piercings in her upper lip (a "Monroe") and in her chest cleavage.  (Doc. No. 35-2 at pp. 13-14; Doc. No. 42-5 at pp. 13-14.)

with the Dress Code.  (Doc. No. 35-2 at pp. 31-32; Doc. No. 35-3 at pp. 9-12; Doc. No. 35-4 at p. 9; Doc. No. 42-5 at pp. 31-32.)  Dr. Piccolo gave Plaintiff permission to wear clear or flesh-colored studs in her piercings while she was at school.  (Doc. No. 35-2 at pp. 31-32; Doc. No. 35-3 at pp. 9-12; Doc. No. 35-4 at p. 9; Doc. No. 42-5 at pp. 31-32.)  Plaintiff and her father therefore went to the mall and bought clear, plastic studs.  (Doc. No. 35-2 at p. 15; Doc. No. 42-5 at p. 15.)

Plaintiff wore the plastic studs in her piercings to school for a few days until her lip became infected.  (Doc. No. 35-2 at p. 16; Doc. No. 42-5 at p. 16.)  To avoid further infection, Plaintiff removed the plastic studs and replaced them with metal ones.  (Doc. No. 35-2 at p. 16; Doc. No. 42-5 at p. 16.)  Plaintiff developed a practice of taking the metal studs out when she walked passed school administrators in the morning and would then put the metal jewelry back into her piercings for the rest of the school day.  (Doc. No. 35-2 at pp. 18-19; Doc. No. 42-5 at pp. 18-19.)  Plaintiff was caught once wearing metal jewelry in her piercings at school and was given lunch detention for five days.  (Doc. No. 35-2 at pp. 17, 23-25; Doc. No. 42-5 at pp. 17, 23-25.)  She continues to wear jewelry in her piercings and has not been further disciplined.  (Doc. No. 35-2 at pp. 19, 25; Doc. No. 42-5 at pp. 19, 25.)  Plaintiff wears this jewelry to convey a message of individuality and non-conformity.  (Doc. No. 35-2 at pp. 28-31; Doc. No. 42-5 at pp. 28-31.)

## Standard of Review

A party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259 (11th Cir. 2004).  An issue of fact is

"material" if, under the applicable substantive law, it might affect the outcome of the case. *Hickson Corp.*, 357 F.3d at 1259. An issue of fact is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party. *Id.* at 1260. A court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.*; *Anderson*, 477 U.S. at 251-52.

The party moving for summary judgment has the burden of proving that: (1) there is no genuine issue as to any material fact, and (2) it is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In determining whether the moving party has satisfied its burden, the court considers all inferences drawn from the underlying facts in the light most favorable to the party opposing the motion and resolves all reasonable doubts against the moving party. *Anderson*, 477 U.S. at 255. The court may not weigh conflicting evidence or weigh the credibility of the parties. *Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 919 (11th Cir. 1993). If a reasonable fact finder could draw more than one inference from the facts and that inference creates an issue of material fact, a court must not grant summary judgment. *Id.* On the other hand, summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322.

## Analysis

Plaintiff makes four challenges to the School Board's Dress Code Policy: (1) the policy is facially invalid; (2) the policy is overly broad; (3) the policy is void for vagueness; and (4) the policy is invalid as applied to Plaintiff. (Doc. No. 10.) Each of these four challenges will be considered in turn.

## I.      Facial Challenge

When considering a First Amendment challenge to a state regulation, the Court must go through three steps of analysis. *E.g.*, *DA Mortgage, Inc. v. City of Miami Beach*, 486 F.3d 1254, 1265-69 (11th Cir. 2007). First, the Court must consider whether the regulated conduct is protected speech. *E.g.*, *id.* at 1265-66. Second, if the conduct is protected speech, the Court must decide what level of scrutiny is applicable. *See, e.g.*, *id.* at 1266-67. Finally, the Court must determine whether the regulation meets this standard of scrutiny. *E.g.*, *id.* at 1267-69.

### A.      Expressive Conduct

As a threshold matter, the Court must consider whether the regulated activity at issue constitutes speech protected under the First Amendment to the United States Constitution. *Id.* at 1265; *Ward v. County of Orange*, 55 F. Supp. 2d 1325, 1331 (M.D. Fla. 1999). The First Amendment, as applied to the states through the Fourteenth Amendment, "guarantees students (and all people) the right to engage not only in 'pure speech,' but 'expressive conduct,' as well." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1270 (11th Cir. 2004) (citations omitted). According to the Supreme Court, to determine whether a particular action counts as expressive conduct, a court must decide whether "[a]n intent to convey a particularized message was present, and in the surrounding circumstances the likelihood was great that the message would be understood by those who viewed it." *Texas v. Johnson*, 491 U.S. 397, 404 (1989) (quoting *Spence v. Washington*, 418 U.S. 405, 410-11 (1974)).

As the Eleventh Circuit Court of Appeals explained, the Supreme Court has somewhat liberalized the latter half of the *Spence-Johnson* standard for expressive conduct. *Holloman ex rel. Holloman*, 370 F.3d at 1270. The Supreme Court clarified that "a narrow, succinctly articulable

message is not a condition of constitutional protection, which if confined to expressions conveying a 'particularized message,' would never reach the unquestionably shielded painting of Jackson Pollock, music of Arnold Schönberg, or Jabberwocky verse of Lewis Carroll." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557, 569 (1995) (internal citation omitted). The Eleventh Circuit interpreted this to mean that when a court is determining whether conduct is expressive, the court must "ask whether [a] reasonable person would interpret it as *some* sort of message, not whether an observer would necessarily infer a *specific* message." *Holloman ex rel. Holloman*, 370 F.3d at 1270. The test for expressive conduct is therefore: (1) whether the actor had an intent to convey a particularized message in his or her conduct, and (2) whether a reasonable person would interpret the actor's conduct as conveying some sort of message. *Hurley*, 515 U.S. at 569; *Holloman ex rel. Holloman*, 370 F.3d at 1270.

Plaintiff has offered evidence of her intent to communicate a particularized message by wearing jewelry in her piercings. (Doc. No. 35-6 at p. 1, ¶¶ 2-3.) Both parties have offered evidence on the issue of whether a reasonable person would interpret the wearing of jewelry by Plaintiff in her piercings as communicative. (Doc. Nos. 42-4, 46-2, 46-3, 46-4.) Since a later stage of the analysis is dispositive of Plaintiff's Motion, the Court will assume without deciding that jewelry wearing is expressive conduct and political speech protected by the First Amendment.

## B.    Level of Protection Under the First Amendment

Once a regulated activity is determined to be protected speech, a court must decide what level of protection is required by the First Amendment. *See, e.g.*, *DA Mortgage, Inc.*, 486 F.3d at 1266-67. The applicable level of protection necessarily depends on the overall context of the speech

and regulation involved.  *See, e.g.*, *id.*; *Bannon ex rel. Harris v. Sch. Dist.*, 387 F.3d 1208, 1212-14 (11th Cir. 2004).

### 1.    The *Tinker* Standard

The First Amendment standard for student speech in public high schools stems from the decision of the United States Supreme Court in *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969).  There the Court recognized that "the wearing of an armband for the purpose of expressing certain views is the type of symbolic act that is within the Free Speech Clause of the First Amendment."  *Id.* at 505.  In applying this principle to public school students who wore black armbands to school to protest the hostilities in Vietnam, the Court explained, "First Amendment rights, applied in light of the special characteristics of the school environment, are available to teachers and students.   It can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate."  *Id.* at 506.

Having decided that student expression was subject to First Amendment protection, the *Tinker* Court next considered the overall context of the suppressed speech and contested regulation. *Id.* at 507, 510-11.  The Court concluded that the student speech at issue was purely political.  *Id.* at 505-10.  Furthermore, the Court stated,  "In order for the State in the person of school officials to justify *prohibition of a particular expression of opinion*, it must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint."  *Id.* at 509 (emphasis added).  Thus, the regulation at issue in *Tinker* involved viewpoint-hostile suppression of a student's particular political opinion. *Id.*

Lastly, the Court defined the standard of scrutiny to apply to this type of regulation: "[T]he prohibition of expression of one particular opinion, at least without evidence that it is necessary to avoid material and substantial interference with schoolwork or discipline, is not constitutionally permissible." *Id.* at 511; *see also id.* at 509 (adopting the same language from the standard set forth by the Fifth Circuit Court of Appeals in *Burnside v. Byars*, 363 F.2d 744, 749 (5th Cir. 1966)).  The Court explained that it is the school's burden to offer either evidence of a disturbance or disorder in fact caused by the expressive conduct or "facts which might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities." *Id.* at 514; *see also id.* at 509 ("In the present case, the District Court made no such finding, and our independent examination of the record fails to yield evidence that the school authorities had reason to anticipate that the wearing of the armbands would substantially interfere with the work of the school or impinge upon the rights of other students.").  Finally, the Court warned, "[I]n our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression." *Id.* at 508.

### 2.      Interpretations of the *Tinker* Standard

Courts at all levels have demonstrated confusion as to the scope of *Tinker*'s holding.  Courts recognize the factual limitations in *Tinker*: the school policy at issue in that case was a viewpoint-hostile regulation of political speech.  Courts disagree, however, as to the broader question of whether the legal standard in *Tinker* is applicable more generally to all regulation of student speech and not simply speech that expresses a particularized view.  In other words, the dispute involves whether there should be a distinction between school speech regulation that is viewpoint-hostile and school conduct regulation that only incidentally burdens student expression.

The Supreme Court itself has not been consistent in its description of the scope of *Tinker*. In *Bethel Sch. Dist. No. 403 v. Fraser*, a case which upheld the school's ability to regulate a student's offensive speech during a high school assembly, the Supreme Court stated, "Unlike the sanctions imposed on the students wearing armbands in *Tinker*, the penalties imposed in this case were *unrelated to any political viewpoint*," supporting the view that the *Tinker* standard is limited to viewpoint hostile regulation. *Fraser*, 478 U.S. 675, 685 (1986) (emphasis added). However, when addressing the censorship of a school sponsored newspaper in *Hazelwood Sch. Dist. v. Kuhlmeier*, the Supreme Court described the *Tinker* standard as applying generally to regulation of students "expressing their personal views on the school premises." *Kuhlmeier*, 484 U.S. 260, 266 (1988). Nevertheless, the *Kuhlmeier* Court concluded that "the standard articulated in *Tinker* for determining when a school may punish student expression need not also be the standard for determining when a school may refuse to lend its name and resources to the dissemination of student expression." *Id.* at 272-73.

The Supreme Court's most recent decision in *Morse v. Frederick*, a case involving student advocacy of illegal conduct off school premises during a school sponsored break ("BONG HiTS 4 JESUS"), did little to clarify the scope of *Tinker*'s holding. *Morse*, 127 S. Ct. 2618 (2007). The Court again described *Tinker* as articulating the standard for suppression of "student expression" generally, but then distinguished the case by describing *Tinker* as applying only to suppression of a particular viewpoint. *Id.* at 2626, 2629. Furthermore, the Court described *Fraser* as establishing that "the mode of analysis set forth in *Tinker* is not absolute." *Id.* at 2627.

The disagreement among the Circuit Courts of Appeal as to whether *Tinker*'s holding applies to all regulation of student speech or only to viewpoint-based regulation was recognized by the

Second Circuit Court of Appeals in *Guiles ex rel. Guiles v. Marineau*, 461 F.3d 320, 326 (2d Cir. 2006). There the Second Circuit stated, "It is not entirely clear whether *Tinker*'s rule applies to all student speech that is not sponsored by schools, subject to the rule of *Fraser*, or whether it applies only to political speech or to political viewpoint-based discrimination." *Id.* The Eleventh Circuit has not directly considered the issue.[2] Those Circuits that have considered the issue are split on whether *Tinker* applies to content-neutral regulation of student conduct that only incidentally burdens student expression. Some courts have viewed *Tinker* as the basic standard of protection for all regulation of student speech. *E.g.*, *Pinard v. Clatskanie Sch. Dist. 6J*, 467 F.3d 755, 759 n. 1 (9th Cir. 2006); *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 214 (3d Cir. 2001). Other courts have viewed *Tinker* as the standard only for viewpoint-hostile regulation of student speech. *E.g.*, *Blau v. Forth Thomas Pub. Sch. Dist.*, 401 F.3d 381, 391-93 (6th Cir. 2005); *Canady v. Bossier Parish Sch. Bd.*, 240 F.3d 437, 441-44 (5th Cir. 2001). This Court adopts the latter interpretation for the reasons stated below.

In the context of adult speech, the Supreme Court has held that the government may not regulate political speech based on "its substantive content or the message it conveys." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995). From this premise, the Court has created exceptions for non-political speech. *E.g.*, *Cent. Hudson Gas & Elec. Corp. v. Public Serv.*

---

[2]    The Eleventh Circuit has used broad language suggesting the *Tinker* standard applies to all regulation of student speech. *E.g.*, *Heinkel ex rel. Heinkel v. Sch. Bd.*, 194 F. App'x 604, 609 (11th Cir. 2006) (stating, in a case involving a content-based regulation, that *Tinker* applies generally to "restraint of student expression"). The Court has also used language suggesting that *Tinker* only applies to viewpoint-based regulation of student speech. *E.g.*, *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1293 (11th Cir. 2007) (explaining that the *Tinker* rule permits the prohibition of "particular expressions"). The Court has not yet decided a case on the basis of the content-neutrality of a school regulation of student expressive conduct.

*Comm'n*, 447 U.S. 557, 562-63 (1980) ("The Constitution . . . affords a lesser protection to commercial speech than to other constitutionally guaranteed expression."). The Court has also created exceptions for conduct regulation that only incidentally infringes expression. *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 298-99 n. 8 (1984) ("Reasonable time, place, or manner restrictions are valid even though they directly limit oral or written expression. It would be odd to insist on a higher standard for limitations aimed at regulable conduct and having only an incidental impact on speech."). The Court affords speech falling into these excepted categories less protection than viewpoint-hostile regulation of political speech. *E.g.*, *id.*; *Cent. Hudson Gas & Elec. Corp.*, 447 U.S. at 562-6.

In the student speech context, the Supreme Court appears to be following the same pattern. The Court has held that a school may not regulate student political speech based on its substantive content or the message it conveys absent a showing that the regulation is necessary to avoid material and substantial interference with schoolwork or discipline. *Tinker*, 393 U.S. at 511. Like with adult speech, the Court has carved out exceptions to this standard based on the category of speech involved. *E.g.*, *Morse*, 127 S. Ct. 2618 (student advocacy of illegal conduct during a school approved break); *Kuhlmeier*, 484 U.S. 260 (school-sponsored speech in a high school newspaper); *Fraser*, 478 U.S. 675 (offensive student speech during a school assembly). As with the recognized exceptions of adult speech, these exceptions are afforded less protection than viewpoint-hostile regulation of political speech. *Compare Tinker*, 393 U.S. at 511 *with Morse*, 127 S.Ct. at 2629. Therefore, this Court concludes that the Supreme Court's student speech analysis will continue to parallel its adult speech analysis, and that the Supreme Court will recognize an exception for school conduct regulation that only incidentally infringes student expression.

Furthermore, the Supreme Court has consistently held that student speech while at school is given less, not more, protection than adult speech. *E.g.*, *Morse*, 127 S. Ct. at 2626-27. It would therefore be illogical to provide more protection to student expressive conduct than is provided to adult expressive conduct. The *Tinker* standard of scrutiny for regulation of student speech is more demanding than the time, place, and manner standard of scrutiny for content-neutral regulation of adult expressive conduct. *Canady*, 240 F.3d at 443. *Tinker* therefore cannot apply to content-neutral regulation of student expressive conduct.[3]

The Circuit Courts of Appeal that have similarly reached this conclusion apply the time, place, and manner balancing test to content-neutral regulation of student expressive conduct. *E.g.*, *Blau*, 401 F.3d at 391-93; *Canady*, 240 F.3d at 441-44. The Fifth Circuit explained:

> Because (1) choice of clothing is personal expression that happens to occur on the school premises and (2) the School Board's uniform policy is unrelated to any viewpoint, a level of scrutiny should apply in this case that is higher than the standard in *Kuhlmeier*, but less stringent than the school official's burden in *Tinker*.

*Canady*, 240 F.3d at 443. The *Canady* Court concluded that the balancing test used for time, and manner regulation was the appropriate intermediate level of scrutiny. *Id.* The Court finds this reasoning persuasive and will apply the time, place, and manner balancing test to content-neutral regulation of expressive student conduct.

### C.   Facial Validity of Defendant's Dress Code Policy

### 1.   Content-Neutral Regulation of Conduct

---

[3]    Neither party argues, nor does this Court find, that any of the other standards for student speech apply. Plaintiff's display of jewelry is not offensive and therefore is not subject to *Fraser*. Her jewelry certainly is not school-sponsored speech and thus *Kuhlmeier* does not apply. Finally, it is not reasonable to infer that Plaintiff's jewelry presentation is advocacy of an illegal act; therefore, *Morse* does not apply.

Before applying the balancing test, however, the Court must determine whether the Defendant's Dress Code is in fact a content-neutral regulation that only incidentally burdens student speech.  Plaintiff has offered no evidence that Defendant promulgated its Dress Code to suppress student speech generally or particular messages specifically.  In contrast, Defendant has offered evidence of the content-neutrality of its policy.  For instance, the introduction to Defendant's Dress Code states:

> The Board will not interfere with the right of students and their parents to make decisions regarding their appearance, however, the standards of appearance for students shall ensure that the student be clean, neat, and properly dressed.  They shall observe modes of dress and standards of personal grooming which are in conformity with the studious atmosphere and good personal hygiene necessary in schools.

(Doc. No. 42-3  at p. 1.)  This introduction gives Defendant's reasons for adopting a dress code that are unrelated to suppression of speech and demonstrates Defendant's attempt to balance the student's interests in expression with the school's interests in regulation.  Significantly, the provision at issue limiting pierced jewelry to the ear makes no reference to viewpoint or message.  (*See id.* at p. 2.)

The Court finds no genuine issue of material fact as to whether Defendant's Dress Code policy was created intentionally to suppress student speech.  The evidence shows that any interference with speech that was caused by the Dress Code was content-neutral, and the Court was not directed to any evidence of viewpoint discrimination.  Accordingly, the Court applies the time, place, or manner balancing test to Defendant's Dress Code policy.

## 2.    The Balancing Test

To determine whether a content-neutral, incidental regulatory interference with expressive conduct is constitutional, courts invoke a balancing test to determine if the regulation is a reasonable time, place, or manner restriction.  *Clark*, 468 U.S. at 298-99 n.8.  This test balances the strength of

the government's interest in regulation, in light of its regulatory alternatives, with the degree of interference with speech, in light of the speaker's communicative alternatives.[4] Courts often describe the state side of the balance as "intermediate scrutiny," which asks "whether the [regulation] is narrowly tailored to achieve a significant government interest . . . ." *E.g.*, *DA Mortgage, Inc.*, 486 F.3d at 1267. Likewise, the speaker side of the balance is frequently described as asking "whether [the regulation] leaves open ample channels for alternative expression." *Id.* at 1268.

### a.    Government's Side of the Balance

### i.    Strength of Government Interest

Regardless of the level of scrutiny applied to school policies regulating student speech, courts have consistently recognized that public schools have a strong interest in regulating the conduct of their students. "Public schools have an interest of constitutional dignity in being allowed to manage their affairs and shape their destiny free of minute supervision by federal judges and juries." *Brandt v. Bd. of Educ.*, 480 F.3d 460, 467 (7th Cir. 2007). In *Fraser*, the Court noted society's interest in the ability of public schools to "teach[] students the boundaries of socially appropriate behavior." *Fraser*, 478 U.S. at 681. The Eleventh Circuit has also found that schools

---

[4]    This is the balancing test used by the Fifth and Sixth Circuits for incidental interferences with student speech and is also the balancing test articulated by the Supreme Court for symbolic speech and time, place, and manner regulation. "The time, place, and manner analysis and the [*United States* v.] *O'Brien* [391 U.S. 367 (1968)] test [for expressive conduct] are virtually the same standards for purposes of assessing the validity of the school uniform policy." *Canady*, 240 F.3d at 443; *see also Clark*, 468 U.S. at 298 (noting the similarities between the time, place, and manner standard and the standard for symbolic speech); Thomas R. McCoy, *Understanding* McConnell v. FEC *and Its Implications for the Constitutional Protection of Corporate Speech*, 54 DePaul L. Rev. 1043, 1045-47 (2005) (explaining the incidental interference standard in the context of general First Amendment analysis).

have an important interest in regulating student conduct.  In *Scott v. Sch. Bd.*, the Eleventh Circuit

found, "[Schools] must have the flexibility to control the tenor and contours of student speech within

school walls or on school property, even if such speech does not result in a reasonable fear of

immediate disruption."  *Scott*, 324 F.3d 1246, 1248 (11th Cir. 2003) (per curiam), *cert. denied*, 540

U.S. 824 (2003).  The *Scott* Court cited *Fraser* for the proposition that schools have a significant

interest in regulating the *manner* of student expression.  *Id.* (quoting *Fraser*, 478 U.S. at 681-83).

Courts have also consistently recognized the significant interest of a high school in

regulating the educational environment through dress and grooming regulation.  *See, e.g.*, *Williams

v. Pryor*, 240 F.3d 944, 948 n. 2 (11th Cir. 2001) (citing *Karr v. Schmidt*, 460 F.2d 609 (5th Cir.

1972) (en banc) for proposition that a "state's interests in education and educational environment .

. . presumptively could justify dress and grooming regulations in high schools"); *Blau*, 401 F.3d at

391 ("the [school] dress code furthers important governmental interests"); *Littlefield v. Forney

Indep. Sch. Dist.*, 268 F.3d 275, 287 (5th Cir. 2001) ("federal courts should defer to school boards

to decide, within constitutional bounds, what constitutes appropriate behavior and dress in public

schools").

Defendant's Dress Code was created to ensure the "studious atmosphere" and "good personal

hygiene" that is "necessary in schools."  (Doc. No. 42-3 at p. 1.)  Plaintiff has made no allegations

that the Dress Code policy was adopted for other purposes, and this Court finds no basis in the

record to determine that the policy was created for any other purpose.  Defendant adopted the policy

to define appropriate behavior and dress in its school system.  It follows, therefore, that Defendant

has a significant interest in regulating the educational environment through its Dress Code.

### ii.      Narrow Tailoring

Once a court determines that the state has a significant interest in regulating speech, the court

must decide whether the state has narrowly tailored the regulation to achieve that interest.  As the

Eleventh Circuit explained:

> The Supreme Court has emphasized that the government does not need to show the
> regulation utilizes the least restrictive means of achieving the government interest.
> A speech-restrictive regulation will satisfy this requirement so long as it "promotes
> a substantial government interest that would be achieved less effectively absent the
> regulation."

*DA Mortgage, Inc.*, 486 F.3d at 1267 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 788-89

(1989)).  Courts typically find that content-neutral school dress codes are narrowly tailored to the

school's interest in regulating the educational environment.  *E.g.*, *Blau*, 401 F.3d at 392; *Littlefield*,

268 F.3d at 287.

Defendant's Dress Code policy is of a limited nature: it does not prohibit all pierced jewelry

but merely limits pierced jewelry to the ear.  (Doc. No. 42-3 at pp. 1-2.)  The policy prohibits only

those forms of jewelry that, in the school's judgment, "pose a safety concern for the student or

others." (*Id.* at p. 2.)  Defendant's interest in maintaining a safe, studious, and hygienic environment

would be achieved less effectively absent the regulation.  Therefore, this policy is narrowly tailored

to achieve the government's interest.

### b.      Speaker's Side of the Balance

### i.      Strength of Student's Interest

Students, no less than adults, have a significant interest in participating in public debate.

Particularly where a student engages in political speech, his or her interest in the speech is strong.

As stated above, the Court assumes without deciding that Plaintiff is engaging in political speech and accordingly recognizes the important speech interests potentially at stake.

### ii.      Alternative Methods of Communication

While a student has a constitutionally protected interest in engaging in political speech at school, the student's speech may be curtailed so long as adequate alternative methods of conveying the message are provided. *E.g.*, *DA Mortgage, Inc.*, 486 F.3d at 1268-69. Courts that have considered the constitutionality of content-neutral dress codes have almost always found that the student has plentiful alternative methods of communication available such that the dress code does not violate the student's First Amendment rights. *E.g.*, *Blau*, 401 F.3d at 393; *Littlefield*, 268 F.3d at 287; *see also Brandt*, 480 F.3d at 468. In considering this issue, the Fifth Circuit stated:

> The School Board's purpose for enacting the uniform policy is to increase test scores and reduce disciplinary problems throughout the school system. This purpose is in no way related to the suppression of student speech. Although students are restricted from wearing clothing of their choice at school, student's remain free to wear what they want after school hours. Students may still express their views through other mediums during the school day. The uniform requirement does not bar the important "personal intercommunication among students" necessary to an effective educational process.

*Canady*, 240 F.3d at 443 (quoting *Tinker*, 393 U.S. at 512).

As with any school dress code, Defendant's policy only regulates the appearance of students while they are at school. Defendant does not prohibit *piercings* in places other than the ear; it only prohibits *wearing jewelry* through piercings in places other than the ear. (Doc. No. 42-3 at p. 2.) Students may communicate whatever messages they would like to convey through wearing pierced jewelry by using countless other communicative alternatives. For instance, they could communicate by talking to each other and engaging in active debate. They can also wear symbolic jewelry

through ear piercings.[5] Thus, Defendant's Dress Code policy leaves open ample adequate alternative methods of communication.

### 3. The Balance

Defendant's Dress Code policy limiting pierced jewelry to the ears is narrowly tailored to further a significant government interest. While students have a significant interest in communication, they also have many alternative methods of communication other than wearing jewelry through various non-otic body piercings. The balance weighs in favor of the regulation; therefore, Defendant's policy is facially constitutional.[6]

### II. Overbreadth Challenge

Plaintiff argues in the alternative that Defendant's Dress Code policy is unconstitutionally overbroad. Under the overbreadth doctrine, a litigant may "assert a facial challenge to a [state regulation] because it could compromise the First Amendment rights of parties not before the Court." *DA Mortgage, Inc.*, 486 F.3d at 1269. For a regulation to be considered overbroad, its application must be "unconstitutional in a substantial portion of cases." *Ward*, 55 F. Supp. 2d at 1333 (quoting *Agan v. Vaughn*, 119 F.3d 1538, 1542 (11th Cir. 1997)). However, the Eleventh Circuit has explained that this doctrine is only applied in cases where the regulation "makes access

---

[5]     Significantly, the Dress Code policy does not forbid communication of a message through ear piercing jewelry.

[6]     Furthermore, the Court hesitates to conclude that federal courts should be involved in the task of mincing permitted jewelry from non-permitted jewelry in high schools. Such distinctions are not matters of law for the courts but are instead disciplinary decisions best left with the schools. *See Fraser*, 478 U.S. at 683 ("The determination of what manner of speech in the classroom or in the school assembly is inappropriate rests with the school board.").

to a forum for speech contingent upon the issuance of a license or permit." *DA Mortgage, Inc.*, 486 F.3d at 1269; *see also, e.g.*, *Heinkel ex rel. Heinkel*, 194 F. App'x 604.

Plaintiff does not allege that her access to school was contingent upon the issuance of a license or permit. (*See* Doc. Nos. 1, 34.) She was punished for her conduct after the fact. (Doc. No. 35-2 at pp. 14, 16-17; Doc. No. 42-5 at pp. 14, 16-17.) She had already pierced her body, inserted the jewelry, and arrived at school in full view of other students when she was first addressed by school administrators. (Doc. No. 35-2 at p. 14; Doc. No. 42-5 at p. 14.) There was no licensing or permitting scheme involved. (*See* Doc. Nos. 35-2, 42-5.) Accordingly, the overbreadth doctrine does not apply in this case.

### III.   Vagueness Challenge

In her Complaint, Plaintiff asserts that Defendant's Dress Code policy is unconstitutionally vague. For a regulation to be void-for-vagueness, it must "fail to give the ordinary citizen adequate notice of what is forbidden and what is permitted." *Horton v. City of St. Augustine*, 272 F.3d 1318, 1330 (11th Cir. 2001) (quoting *City of Chicago v. Morales*, 527 U.S. 41, 60 (1999)). A regulation is not vague when it "uses ordinary terms that have common usage and understanding." *Id.*

Plaintiff cannot seriously argue that the language "[p]ierced jewelry shall be limited to the ear" is vague.[7] Indeed, she appears to have abandoned this argument in her Motion for Summary Judgment and makes no mention of it outside of the Complaint. Therefore, the Court finds that Defendant's Dress Code policy is not void for vagueness.

---

[7]   This is the only part of the Dress Code policy that Plaintiff defied and therefore the only language that the Court considers. Plaintiff has standing to attack only the specific provisions that were applicable to her conduct. *CAMP Legal Def. Fund, Inc. v. City of Atlanta*, 451 F.3d 1257, 1273 (11th Cir. 2006).

IV.     As Applied Challenge

Plaintiff next claims that even if Defendant's Dress Code is facially valid, it is unconstitutional as applied to her.  Plaintiff appears to allege in her Complaint that Defendant is intentionally interfering with her protected speech because Defendant is hostile to her particular message.  (Doc. No. 10 at p. 3, ¶ 18.)  She avers that Defendant's policy "controls expression by promoting some content and viewpoint[s], and by suppressing other content and viewpoint[s], thereby evincing animus towards Ms. Bar-Navon's expressive conduct." (*Id.*)  Despite making these allegations, Plaintiff has offered no evidence of viewpoint-hostile (and therefore intentional) regulation of speech.  In fact, in Plaintiff's Motion for Summary Judgment, she appears to offer contrary evidence that Defendant enforces its policy regardless of her or any other student's viewpoint.[8]  (Doc. No. 34 at p. 6.)

The evidence shows that school officials have applied the policy with complete indifference to Plaintiff's viewpoint.  The policy is applied in a content-neutral manner, and therefore any suppression of Plaintiff's intended message is purely incidental.  Nothing in the record suggests that

---

[8]        Plaintiff argues:

> Nonetheless, Ms. Bar-Navon and other students have been punished for wearing non-otic piercings in high school, regardless of whether such wearing constitutes expressive conduct. (D. Bar-Navon dep., 30:8-31:6; Tormoen dep., 11:14-12:10, 17:13-18:1.)    No administrator ever asked Ms. Bar-Navon (or any other student) about her expressive wearing of piercings, even though Mr. Bar-Navon has told administrators (directly and through this lawsuit) that Danielle's piercings constitute protected expression. (D. Bar-Navon dep., 30:8-31:6; B. Bar-Navon dep., 10:9-21, 11:4-19; Tormoen dep., 20:4-21:4.)

(Doc. No. 34 at p. 6) (internal citations were included in Plaintiff's text).

Plaintiff has been unfairly singled out for disparate treatment or is burdened any more than other students to whom the Dress Code applies.  Plaintiff may wear jewelry in her piercings outside of school and may convey her message during school hours as outlined in Section I(C)(2)(b)(ii) above. Thus, Defendant's Dress Code policy is not unconstitutional as applied to Plaintiff.

### Conclusion

Based on the foregoing, the Court **DENIES** Plaintiff's Motion for summary judgment (Doc. No. 34) and **GRANTS** Defendant's Motion for summary judgment (Doc. No. 40).  Judgment shall be entered for Defendant, and the Clerk of the Court is directed to close the file.

**DONE** and **ORDERED** in Chambers in Orlando, Florida on November   5  , 2007.

PATRICIA C. FAWSETT, CHIEF JUDGE
UNITED STATES DISTRICT COURT

Copies furnished to:
Counsel of Record